Donald L. Ridge, Esq. (SBN. 132171)
**CLARK HILL LLP**
1055 W. Seventh Street, Suite 2400
Los Angeles, CA 90017
Telephone: (213) 891-9100
Facsimile: (213) 488-1178
DRidge@clarkhill.com

*Attorneys for Plaintiffs*
*Pinkerton Tobacco Co., LP,*
*Swedish Match North*
*America LLC, and NYZ AB*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PINKERTON TOBACCO CO., LP, SWEDISH MATCH NORTH AMERICA LLC, and NYZ AB,<br><br>Plaintiffs,<br><br>v.<br><br>KRETEK INTERNATIONAL, INC. and DRYFT SCIENCES, LLC<br><br>Defendants. | **Case No.** 2:20-cv-08729-SB (MRWx)<br><br>**FIRST AMENDED COMPLAINT; DEMAND FOR JURY TRIAL**<br><br>Hon. Stanley Blumenfeld Jr. |

## FIRST AMENDED COMPLAINT

Plaintiffs Pinkerton Tobacco Co., LP ("Pinkerton"), Swedish Match North America, LLC ("Swedish Match North America"), and NYZ AB ("NYZ") (collectively, "Plaintiffs" or "Swedish Match") file this First Amended Complaint against Defendants Kretek International, Inc. ("Kretek") and DRYFT Sciences, LLC ("Dryft Sciences") (collectively, "Defendants"), and allege as follows:

## NATURE OF THE ACTION

1. This is an action for violation of the Defend Trade Secrets Act and for misappropriation of trade secrets under the California Uniform Trade Secret Act.

1

# PARTIES

2. Plaintiff Pinkerton is a Limited Partnership organized and existing under the laws of Delaware, having a principal place of business at 1121 Industrial Drive, Owensboro, Kentucky 42301.

3. Plaintiff Swedish Match North America is a Limited Liability Company organized and existing under the laws of Delaware, having a principal place of business at 1021 E. Cary Street, Suite 1600, Richmond, Virginia 23219.

4. Plaintiff NYZ is a corporation organized and existing under the laws of Sweden, having a principal place of business at Sveavägen 44, 8th floor, SE-111 34 Stockholm and having postal address SE-118 85 Stockholm, Sweden.

5. On information and belief, Defendant Kretek is a corporation organized and existing under the laws of California, having a principal place of business at 5449 Endeavour Court, Moorpark, California 93021.

6. On information and belief, Defendant Dryft Sciences is a limited liability corporation organized and existing under the laws of California, having a principal place of business at 5455 Endeavour Court, Moorpark, California 93021.

7. Defendants are involved or have been involved in the manufacture, distribution, and/or sale of nicotine pouch products ("NP Products") having the trade name, "DRYFT." Swedish Match's trade secrets relate to the composition and method of manufacturing nicotine pouch products ("NP Trade Secrets"). As discussed below, NYZ is the owner of the NP Trade Secrets. Pinkerton and Swedish Match North America are the exclusive licensees of the NP Trade Secrets. On information and belief, each Defendant currently, or in the past, directly or indirectly imports, develops, manufactures, distributes, markets, offers to sell, and/or sells NP Products in the United States, including in the State of California and in this District, and otherwise purposefully directs activities to the same. On information and belief, Defendants have been and are acting in concert and are otherwise liable jointly, severally, or in the alternative.

2

8. Indeed, on information and belief, Kretek has worked and/or currently works with Swedish Match's competitor—TillCe AB ("TillCe") and/or The Art Factory AB ("TAF")—to import, manufacture and/or distribute DRYFT in the United States. In fact, Kretek is currently identified as the importer and/or distributor of DRYFT products. On information and belief, Kretek received the NP Trade Secrets from TillCe and/or TAF so that it could manufacture DRYFT on its own. On information and belief, after receiving the NP Trade Secrets, Kretek formed Dryft Sciences with the purpose of manufacturing, distributing, and selling DRYFT in the United States. On information and belief, Kretek and/or Dryft Sciences began manufacturing DRYFT in the United States at least by May 2020.

## JURISDICTION AND VENUE

9. This action arises under the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. §§ 1836(b)-(c). This action also arises under the California Uniform Trade Secrets Acts ("CUTSA"), Cal. Civ Code §§ 3426.1-3426.11.

10. This Court has subject matter jurisdiction over the federal claims asserted in this Complaint under 28 U.S.C. § 1331 because the action arises under the DTSA. Further, this Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the state-law claims because such claims are so closely related to Plaintiffs' claim for misappropriation of trade secrets under the DTSA that they form part of the same case or controversy.

11. In addition, this Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, excluding interest and costs, and the parties are citizens of different states and/or foreign states.

12. Personal jurisdiction exists over Defendants because, on information and belief, each Defendant is a corporation organized and existing under the laws of California, maintains its principal place of business in this District, and purposefully has conducted and continues to conduct business in this District.

13. Further, on information and belief, this Court has personal jurisdiction over

3

each Defendant because each Defendant has committed acts of trade secret misappropriation in the State of California and in this District. As such, each of the Defendants has established sufficient minimum contacts with this District, such that it should reasonably and fairly anticipate being called into court in this District and has purposefully directed activities at residents of California and this District. Defendants, directly or indirectly, sell DRYFT in California, both in physical retail stores and through online retailers, such as GetDryft.com and Northerner.com (https://www.northerner.com/us/nicotine-pouches/dryft), which is readily accessible to residents of California and this District. Defendants have therefore purposefully directed their commercial activities to residents of California.

14. On information and belief, venue is proper in this federal district pursuant to 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

### Swedish Match's ZYN Product

15. The Swedish Match Group includes Plaintiffs and affiliates of Plaintiffs that operate under the umbrella of Swedish Match AB.

16. The Swedish Match Group is a world leader in the development of nicotine products, such as nicotine pouches, snus, moist snuff, and chewing tobacco. The Swedish Match Group's foremost vision is a world without cigarettes that improves people's lives and health.

17. One of Swedish Match's smokeless and tobacco-free products are its NP Products sold in the United States under the trade name "ZYN." The ZYN product provides users with a healthier alternative to tobacco products.

18. In the United States, Plaintiff Pinkerton manufactures ZYN at its production facility in Owensboro, Kentucky, and Plaintiff Swedish Match North America then sells the ZYN products made by Pinkerton. Due to ZYN's phenomenal success in the marketplace, ZYN has grown to be the market leader for NP Products in the United States.

19. In 2017, Swedish Match announced plans to invest more than $40.9 million in Pinkerton's facility for the purpose of manufacturing ZYN. In May 2019, Swedish Match announced that the investments in Pinkerton's facility would exceed $100 million, bringing more than 120 jobs to that facility.

**Swedish Match's NP Trade Secrets Were Purchased**

**from TillCe for Swedish Match's Exclusive Use**

20. The Swedish Match Group developed ZYN based on NP Trade Secrets purchased from TillCe between 2013 and 2016 for Swedish Match's exclusive use in, among other geographic regions, the United States.

21. Swedish Match's NP Trade Secrets allow for NP Products to be manufactured on a commercial scale in an efficient and cost-effective way. The NP Trade Secrets also relate to processes associated with particle size distribution of the powder included in NP Products. The NP Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, Swedish Match's competitors and others who would obtain economic value from the use or disclosure of that information. Swedish Match actively protects and safeguards the confidentiality of the NP Trade Secrets. For example, Swedish Match implements procedures used to restrict which employees may have access to the NP Trade Secrets.

22. Swedish Match North Europe AB ("Swedish Match North Europe") is the parent company to Plaintiff NYZ and, along with Plaintiffs Swedish Match North America and Pinkerton, is a wholly owned subsidiary of Swedish Match AB. Swedish Match North Europe acquired the ownership of NYZ from TillCe, and, in connection with this acquisition, the rights to the NP Trade Secrets.

23. More specifically, Swedish Match North Europe, TillCe, and Thomas Eriksson (a/k/a "Thomas Ericsson") entered into various agreements in 2013. As part of these agreements, a substantial amount of know-how falling within the scope of the NP Trade Secrets was transferred to Swedish Match North Europe and its affiliates.

24. On or about March 4, 2016, NYZ, TillCe, and Thomas Eriksson entered into a Patent and Technology Transfer Agreement ("2016 Transfer Agreement"), providing, among other things, that NYZ would acquire the NP Trade Secrets from TillCe. At this time, NYZ was a wholly owned subsidiary of TillCe.

25. TillCe and Swedish Match North Europe entered into an agreement ("Share Purchase Agreement") for Swedish Match North Europe to purchase all shares of NYZ. On or about March 15, 2016, Swedish Match North Europe, NYZ, Thomas Eriksson, Art Factory AB (which is different from The Art Factory AB), and TillCe entered into an agreement ("Frame Agreement") related to, among other things, the transfer of the NP Trade Secrets from TillCe to Swedish Match North Europe and its affiliates. According to the Share Purchase Agreement and the Frame Agreement, TillCe and its affiliates agreed to not disclose any of the NP Trade Secrets or other confidential information to any other third-party.

26. To document Pinkerton's and Swedish Match North America's authority to manufacture and sell ZYN—a product based on the NP Trade Secrets—NYZ granted an exclusive license to Pinkerton and an exclusive license to Swedish Match North America. Under these licenses, Plaintiff Pinkerton manufactures ZYN at its production facility in Owensboro, Kentucky, and Plaintiff Swedish Match North America then sells the ZYN products made by Pinkerton.

27. On information and belief, TAF was an affiliate of TillCe at the time the agreements referred to in Paragraphs 24 and 25 were signed. On information and belief, TAF became a separate corporate entity in April 2018—approximately 2 years after the NP Trade Secrets were sold to Swedish Match North Europe and its affiliates.

28. TillCe sold the NP Trade Secrets to Swedish Match North Europe, through the sale of the shares in NYZ, for a substantial monetary amount and for the exclusive use of Swedish Match North Europe and its affiliates in the United States.

29. Further, in February 2018, Swedish Match North Europe initiated in Sweden an arbitration proceeding against TillCe and Thomas Eriksson ("Swedish

1 Arbitration"). The Swedish Arbitration addressed, among other things, whether TillCe and Thomas Eriksson breached certain clauses of the Frame Agreement and the Share Purchase Agreement due to the manufacture and sale of DRYFT. In May 2019, the Swedish Arbitration resulted in a decision finding that TillCe and Thomas Eriksson had breached certain clauses of the Frame Agreement and the Share Purchase Agreement due to, among other things, the manufacture and/or sale of DRYFT. On information and belief, Kretek and/or Dryft Sciences had, at least before September 2019, knowledge of the Swedish Arbitration, including knowledge of Swedish Match North Europe's allegation that the manufacture and sale of DRYFT was a breach of the agreements between Swedish Match North Europe and TillCe and Thomas Eriksson.

**Defendants Misappropriated Swedish Match's NP Trade Secrets**

30. On information and belief, Defendants misappropriated Swedish Match's NP Trade Secrets to wrongfully compete in the U.S. market. Swedish Match became aware of the misappropriation of its NP Trade Secrets in September 2019, when Kretek announced the formation of Dryft Sciences to manufacture DRYFT.

31. On information and belief, Kretek currently, or in the past, imports and distributes DRYFT products on behalf of TillCe and/or TAF. Kretek's website currently states that DRYFT is made in Sweden. Further, online retailer www.northerner.com describes DRYFT products as manufactured in Sweden by "The Art Factory AB" and imported by "Kretek International, Inc."

32. On information and belief, Dryft Sciences is a subsidiary of Kretek. In a September 2019 press release, Kretek announced the formation of Dryft Sciences. The press release states that Dryft Sciences "will focus exclusively on DRYFT nicotine pouches" and that Dryft Sciences is "substantially expanding" the manufacturing capacity of DRYFT through a "new U.S. manufacturing site." According to the press release, the new manufacturing site is expected to have a capacity of 30 million cans in 2020 and 60 million cans by 2021.

33. On information and belief, Kretek and/or Dryft Sciences began

7

manufacturing DRYFT in the United States at least by May 2020.

34. On information and belief, Kretek and/or Dryft Sciences did not, prior to January 2018, manufacture NP Products. Further, on information and belief, before January 2018, Kretek and/or Dryft Sciences had not manufactured DRYFT products for distribution in the United States.

35. Kretek and Dryft Sciences have referred to the DRYFT manufactured by TAF as a "first generation" of DRYFT. Dryft Sciences has also admitted that it was formed in 2019 to manufacture and distribute a "second generation" DRYFT product.

36. On information and belief, Kretek and/or Dryft Sciences previously maintained, or currently maintain, a business relationship with TAF, TillCe, and/or Thomas Eriksson with respect to the manufacture and/or sale of DRYFT.

37. On information and belief, Kretek and/or Dryft Sciences received information from TAF, TillCe, and/or Thomas Eriksson, including information that Kretek and/or Dryft Sciences has used, or continues to use, to manufacture DRYFT or to develop a process for manufacturing DRYFT.

38. On information and belief, Kretek and/or Dryft Sciences received information about the composition of DRYFT from TAF, TillCe, and/or Thomas Eriksson.

39. On information and belief, Kretek and/or Dryft Sciences received, from TAF, TillCe, and/or Thomas Eriksson, information about a way to manufacture a composition contained in DRYFT.

40. On information and belief, Kretek and/or Dryft Sciences manufactures DRYFT using the NP Trade Secrets.

41. On information and belief, Kretek and Dryft Sciences have, have had, and continue to have, a business relationship with Thomas Eriksson, TillCe, and/or TAF with respect to the manufacture, importation, sale and/or distribution of DRYFT. On information and belief, Kretek and Dryft Sciences have leveraged this business relationship to transition from an importer and distributor of DRYFT to a manufacturer

of DRYFT. On information and belief, through this business relationship, Kretek and Dryft Sciences wrongfully acquired Swedish Match's NP Trade Secrets, prior to the September 2019 press release, in an effort to become a manufacturer of DRYFT. On information and belief, Kretek and Dryft Sciences were aware that the NP Trade Secrets were being acquired and used in violation of the confidentiality agreements between TillCe and Swedish Match.

42. As Kretek and/or Dryft Sciences were well aware, the time and money required to develop an adequate nicotine pouch was significant. On information and belief, Kretek and/or Dryft Sciences acquired, directly or indirectly, from TillCe and/or TAF certain technology and know-how to manufacture DRYFT products. On information and belief, Kretek and Dryft Sciences each acquired, directly or indirectly, the NP Trade Secrets from TillCe and/or TAF and knew or had reason to know that the NP Trade Secrets were acquired by improper means. On information and belief, Kretek and Dryft Sciences were aware, or had reason to be aware, of the agreements between TillCe and Swedish Match. On information and belief, Kretek and Dryft Sciences knew or had reason to know that Swedish Match did not consent to TillCe and/or TAF disclosing Swedish Match's NP Trade Secrets to any third party. On information and belief, Kretek and Dryft Sciences misappropriated the NP Trade Secrets because they wrongfully acquired, disclosed, and used the NP Trade Secrets and knew or should have known that the NP Trade Secrets were acquired through a breach of the duty to maintain secrecy.

43. Kretek and/or Dryft Sciences were aware of the time, effort, investment, and resources required to develop a desirable NP Product, such as DRYFT, and the time, effort, investment, and resources required to develop a manufacturing process to produce that product on a commercial scale.

44. On information and belief, Kretek and Dryft Sciences could not have independently developed their DRYFT product, and a process to commercially manufacture that product, without the wrongful acquisition, disclosure, and use of the

9

NP Trade Secrets. On information and belief, given the time, effort, investment, and resources necessary to formulate a NP Product and the time, effort, investment, and resources required to develop an efficient process to manufacture that product on a commercial scale, Kretek and Dryft Sciences—without the wrongful acquisition and use of Swedish Match's NP Trade Secrets—would not be able to transition from a mere importer of DRYFT in 2019 to a commercial manufacturer of DRYFT in 2020 able to produce 30 million cans in a year. Therefore, on information and belief, instead of developing its own product, Kretek and Dryft Sciences chose to misappropriate Swedish Match's NP Trade Secrets in order to manufacture Accused Product DRYFT.

45. Further, in May 2016, the U.S. Food and Drug Administration ("FDA") published regulations applicable to nicotine pouches ("FDA Regulations"). According to these FDA Regulations, any tobacco-free pouch on the market at the time could remain on the market, provided an application for FDA approval was obtained at a future date in 2022 (later changed to a date in 2020). Kretek and Dryft Sciences would not be able to change the composition of DRYFT without the risk of the FDA removing DRYFT from the market.

46. On information and belief, the composition of DRYFT currently manufactured by Kretek and/or Dryft Sciences is the same as the composition of DRYFT manufactured by TillCe and/or TAF prior to January 2018.

47. On information and belief, the process currently used by Kretek and/or Dryft Sciences to manufacture DRYFT is the same as the process used by TillCe and/or TAF for manufacturing the DRYFT products distributed by Kretek prior to January 2018.

48. On information and belief, Kretek and/or Dryft Sciences manufactures, at least in part, DRYFT in the United States. On information and belief, any such DRYFT manufactured in the United States by Kretek and/or Dryft Sciences has the same composition as the DRYFT sold in the United States before August 8, 2016.

**Defendants Misappropriation Has Damaged Swedish Match**

49. On information and belief, Kretek and Dryft Sciences improperly acquired and used (and continue to use) Swedish Match's NP Trade Secrets. Instead of investing the substantial time and resources to compete legitimately with Swedish Match, Defendants have used, and continue to use, Swedish Match's NP Trade Secrets in the composition and manufacture of DRYFT.

50. Swedish Match thus requests that this Court award reasonable compensation for Defendants' misappropriation of Swedish Match's NP Trade Secrets, including exemplary damages for Defendants' willful and malicious misappropriation, and further requests that this Court grant an injunction against Defendants to prevent ongoing wrongful use and disclosure of Swedish Match's NP Trade Secrets.

## COUNT I

### Violation of the Defend Trade Secrets Act

51. Swedish Match realleges and incorporates by reference all of the preceding paragraphs as if fully set forth in this paragraph.

52. The DTSA provides a federal private right of action for misappropriation of trade secrets. 18 U.S.C. § 1836(b). Swedish Match owns trade secrets, as defined by the DTSA, which relate to Swedish Match's NP Product technology and which Defendants have willfully and maliciously misappropriated. Swedish Match's NP Trade Secrets are used in the composition and manufacture of NP Products that are used and intended for use in interstate commerce.

53. Swedish Match took reasonable measures to ensure the confidentiality of its NP Trade Secrets, including the execution by Swedish Match North Europe of at least the 2013 agreements, the Frame Agreement, the 2016 Transfer Agreement, and the Share Purchase Agreement. These agreements include provisions intended to safeguard the confidentiality of Swedish Match's NP Trade Secrets.

54. Defendants have misappropriated Swedish Match's NP Trade Secrets at least by the use and threatened use of the NP Trade Secrets without Swedish Match's

consent, and by having acquired the NP Trade Secrets under circumstances giving rise to duties to maintain the secrecy of the NP Trade Secrets and to limit their use. Defendants' unauthorized and improper use of Swedish Match's NP Trade Secrets occurred after the enactment of the DTSA in May 2016, and such unauthorized and improper use is ongoing and continues to this day.

55. Swedish Match has no adequate remedy at law to protect against Defendants' actual and threatened misappropriation and use of Swedish Match's NP Trade Secrets. Moreover, Defendants' misappropriation and use of the NP Trade Secrets has caused and will cause irreparable injury to Swedish Match, including the loss of customer goodwill, competitive position, and future business. No amount of money can fully and accurately compensate Swedish Match for these losses, and Swedish Match's remedies at law are therefore inadequate. Thus, injunctive relief is necessary and appropriate to restrain Defendants' misappropriation.

56. As a direct and proximate result of Defendants' actual and threatened misappropriation of Swedish Match's NP Trade Secrets, Plaintiffs have suffered damages and Defendants have been unjustly enriched. Thus, Swedish Match is entitled to relief under the DTSA. By reason of Defendants' willful and malicious acts of misappropriation, Swedish Match is also entitled to exemplary damages and attorneys' fees under the DTSA.

## COUNT II

### Violation of the California Uniform Trade Secrets Act

57. Swedish Match realleges and incorporates by reference all of the preceding paragraphs as if fully set forth in this paragraph.

58. Swedish Match's confidential information regarding its NP Product technology constitutes trade secret information under the California Trade Secrets Act, Cal. Civ. Code § 3426.1. Swedish Match's NP Trade Secrets are extremely valuable to Swedish Match, and Swedish Match has expended considerable time, effort, and money to develop and safeguard them. With this information, Swedish Match has been able to

compete more effectively for business in the field of NP Products. By misappropriating Swedish Match's NP Trade Secrets, Defendants have been, and will continue to, compete unfairly with Swedish Match in the growing NP Products market.

59. Swedish Match is informed and believes, and thereupon alleges, that Defendant have willfully and maliciously misappropriated Swedish Match's NP Trade Secrets relating to its NP Product technology. Defendants have engaged in use and threatened use of Swedish Match's NP Trade Secrets without Swedish Match's consent and have acquired the NP Trade Secrets under circumstances giving rise to duties to maintain their secrecy and limit their use. Defendants' unauthorized and improper misappropriation of Swedish Match's NP Trade Secrets is ongoing and continues to this day.

60. Unless enjoined by this Court, Defendants will continue to misappropriate Swedish Match's NP Trade Secrets. Moreover, Defendants' misappropriation and use of Swedish Match's NP Trade Secrets has caused and will cause irreparable injury to Swedish Match, including the loss of customer goodwill, competitive position, and future business. No amount of money can fully compensate Swedish Match for these losses, and Swedish Match's remedies at law are therefore inadequate. Thus, injunctive relief is necessary and appropriate to restrain Defendants' misappropriation.

61. As a direct and proximate result of Defendants' actual and threatened misappropriation of Swedish Match's NP Trade Secrets, Swedish Match has suffered losses and Defendants have been unjustly enriched. Thus, Swedish Match is entitled to damages. By reason of Defendants' willful and malicious acts of misappropriation, Swedish Match is also entitled to exemplary damages and attorneys' fees.

## **PRAYER FOR RELIEF**

Wherefore, Swedish Match respectfully requests:

(a) Judgment be entered that Defendants have misappropriated Swedish Match's NP Trade Secrets;

(b) That the Court enjoin Defendants from disclosing, using, or allowing any

other individual or entity to disclose or use, for any purpose, Swedish Match's NP Trade Secrets and confidential information;

    (c)    That the Court award Swedish Match damages caused by Defendants' misappropriation of Swedish Match's NP Trade Secrets;

    (d)    That the Court award Swedish Match damages for the unjust enrichment caused by Defendants' misappropriation of Swedish Match's NP Trade Secrets;

    (e)    That the Court award Swedish Match exemplary damages caused by Defendants' willful and malicious misappropriation of Swedish Match's NP Trade Secrets;

    (f)    That the Court award Swedish Match pre-judgment and post-judgment interest where applicable;

    (g)    That the Court award Swedish Match the reasonable attorneys' fees and costs that it incurs in bringing and prosecuting this action; and

    (h)    That the Court award Swedish Match any other relief this Court deems just and equitable.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues triable of right by a jury.

Dated: February 26, 2021    **CLARK HILL LLP**

By:     /s/
    Donald L. Ridge

Attorneys for Plaintiffs
Pinkerton Tobacco Co., LP, Swedish Match North America LLC, and NYZ AB